CARAWAY, J.
| ¶ This dispute between two physicians concerns a three-year employment agreement governing their relationship in a medical practice. The defendant and his medical corporation hired the plaintiff. At the end of the three-year term of the contract following written and other exchanges between the parties, the employment relationship ended. This led to various disputes concerning the contract’s covenant not to compete, the manner in which the contract ended, an obligation to pay for the cost of continued malpractice insurance, the final payment of compensation owed to the plaintiff for his employment, statutory wage penalties, and attorney fees. Following a judgment against them for these claims totaling $342,319.60, the defendant doctor and his corporation appeal. For the following reasons, we affirm in part and reverse in part.

Facts and Procedural Background

Plaintiff, Dr. Landon Smith, filed this contract claim against his former employer, Obstetrics and Gynecology medical corporation, headed by Dr. Leslie Coffman (hereinafter collectively “Coffman”). In 2005, Coffman hired Dr. Smith to join his obstetrics and gynecology practice in Oua-chita Parish and the parties signed an employment agreement (hereinafter the “Contract”) on June 24, 2005. The Contract was for a three-year term, ending on *140 August 15, 2008. The Contract would automatically renew for an additional year unless either party gave written notice to withdraw from the contract at least 30 days prior to the end of the term. Dr. 12Smith was given an annual salary of $250,000, and Coffman agreed to pay his malpractice insurance.
The relevant provisions of the Contract are as follows:
1. Employment and Term. Subject to earlier termination as provided for in Section 13 hereof, the Employer hereby employs Employee, and Employee hereby accepts employment with the Employer, commencing August 15, 2005 (hereinafter the “Effective Date”) and continuing for a period of three (3) years (hereinafter the “Term of Employment”). Each 12-month period commencing on August 15 and ending on the following August 14 is referred to as the “Contract Year”. Upon the expiration of the Term of Employment, this Agreement shall automatically be renewed for successive one (1) year periods commencing upon the first anniversary of the Effective Date, unless either party gives written notice of intent not to renew not less than thirty (30), nor more than sixty (60), days prior to the end of any term.
12. Professional Liability Insurance
b.Tail Coverage. Upon termination of Employee’s employment with Employer for any reason whatsoever, whether voluntary or involuntary, Employee shall obtain a professional liability insurance ‘tail’ coverage policy in the amount of not less than $500,000 per occurrence, and not less than $500,000 in the aggregate for each year, such tail coverage policy to provide coverage of Employee and Employer for all occurrences and events during Employee’s employment with Employer.
In the event Employee: (i) voluntarily terminates or resigns his employment hereunder, or (ii) is terminated for cause pursuant to Section 13, then, in either such event, the cost of the ‘tail’ insurance required by this subsection (b) shall be paid exclusively by Employee. In the event Employer terminates Employee’s employment hereunder for any reason other than cause under Section 13, then the cost of the ‘tail’ insurance required by this subsection (b) shall be paid exclusively by Employer.
13. Termination. Notwithstanding any other provisions of this Agreement, the Term of Employment shall terminate upon:
a. the death of Employee; or
b. upon Employee’s “disability” ...; or
c. at Employer’s option, immediately upon the existence of “cause” ...; or
d. at Employer’s option, upon thirty (30) days written notice to Employee.
|a15. Transition following Notice of Termination. Following any notice of termination of the employment of Employee hereunder, whether given by Employer or Employee, Employee will fully cooperate with Employer in all matters relating to the winding up of Employee’s pending work on behalf of Employer and the orderly transfer of such work to the other professional employees of Employer. On or after the giving of notice of termination hereunder and during any notice period, Employer will be entitled to such full-time or part-time services of Employee as Employer may reasonably require, and Employer will specifically have the right to terminate the active services of Employee at the time such notice is given and to pay the Employee the compensation due to him under the Agreement for the duration of the notice period.
*141 16. Non-Competition. During the Term of Employment (or any renewal period) and for a continuous period of two (2) years thereafter commencing upon expiration or termination of the Term of Employment (or any renewal period), regardless of any termination pursuant to Section 13 or any voluntary termination or resignation by Employee, Employee shall not without the written consent of Employer, individually or jointly with others, directly or indirectly, whether for his own account or for that of any other person or entity, own or hold any ownership or voting interest in any person or entity engaged in a business the same as or similar to any business of the Employer, or in a business which competes in any manner whatsoever with the business of Employer or Employer’s Facility, and which is located or intended to be located anywhere within Ouachita Parish, Louisiana, and any other Parish in which Employer does business at the time of termination of employment of Employee.
35. Costs of Enforcement. In the event it is necessary for any party to retain the services of an attorney or to initiate legal proceedings to enforce the terms of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party, in addition to all other remedies, all costs of such enforcement, including reasonable attorneys’ fees and costs and including trial and appellate proceedings.
For over two years, Dr. Smith settled into the medical practice with Coffman. Coffman even gave him $30,000 for a down payment on a house. In November 2007, however, Dr. Smith learned that, prior to his arrival, the business manager, Cherice Cottrell, had told their employees to steer patients away from him so that he would not meet his bonus quota. When |4he approached her about it, she explained that they merely did not steer patients in his direction for a couple of months while they made sure that he was a good fit for the office. Additionally, she admitted to Dr. Smith that the bonus schedule was virtually unobtainable.
In January 2008, Dr. Coffman and accountant Craig Carnick met to negotiate a new contract with Dr. Smith. Dr. Smith made a request for an increase in salary to $400,000 and for financial assistance to pay off his student loans. No agreement for such compensation and an extension of the parties’ contract was reached. In March 2008, Cottrell informed Dr. Smith that he would receive a $50,000 raise in his salary which was effective immediately. She also gave him a new and obtainable bonus schedule.
In his testimony, Dr. Smith admitted that on June 26, 2008, he told an office assistant that he would prefer to not have any new OB patients because the contract negotiations had never been finalized. The following day, Dr. Smith and Cottrell had a conversation where he allegedly expressed his frustration over his student loans and production bonuses. While Dr. Smith denies the allegation, Cottrell testified that he told her that he would not be renewing his contract.
After a vacation, Dr. Smith returned to work on July 3 and found a letter from Dr. Coffman on his desk. The letter stated:
Landon,
I truly regret that you will be leaving this practice. I hoped that we would have a long and positive professional relationship. However, I understand your decision to pursue your own opportunities.
Be assured that I will honor my contractual responsibilities to you, through the end of your contract.
*142 | .-'Previously, I asked Craig Carniek and his associate, Bill VanKeulen, to analyze the available financial information, and to develop a plan which would be “revenue neutral” to this practice.
By the term “revenue neutral”, I mean a contract in which you neither cost the practice any money, nor would the practice make any money from your production.
While the underlying principle is totally fair, I understand that the numbers we could offer, based upon your past production and the environment of decreasing reimbursements, are such that they are unacceptable to you. I also understand that you expressed problems with steerage of patients and the image of the practice.
Since you will not be continuing in this practice, for the continuity of patient care, I may decide that it is best to relieve you of your routine daily patient care responsibilities. This would free up time for you to spend with your children, and for you to take the necessary steps to pursue your next opportunity. If this occurs, I will, of course, continue to pay you, but I may ask that you be available for some coverage.
As I previously stated, I will honor our responsibilities to you, including all salary owed to you for the remainder of your contractual period.
I am having our corporate attorney, Bob Collier, prepare all documents to facilitate the termination of our professional relationship. There are a number of details to finalize.
It has been a pleasure knowing and working with you. I wish you success in your future practice.
s/Leslie Coffman
On July 7, Cottrell called Dr. Smith to tell him that he was relieved of his patient care responsibilities and that he no longer needed to report to work.
Around this time, Coffman entered into a letter of intent with Dr. Figueroa to use his Ruston office to see patients. On July 8, Cottrell informed the office staff that they were going to start seeing patients in Ruston, and on July 9, Coffman placed an advertisement in Ruston’s newspaper informing the public of such intent.
On August 8, 2008, Dr. Smith received a letter and his final paycheck from Coff-man’s attorney, Robert Collier. In this letter, Collier stated:
I enclose the final salary check under your employment agreement with Dr. Coffman’s professional corporation. Any bonus Indue to you for the 3rd quarter of 2008 (ending on 9/30/08) will be computed and forwarded to you after the end of the quarter, in accordance with the employment agreement.
As you are aware, your employment agreement ends by its own terms on August 15, 2008. Also, as you are aware, certain provisions of the employment agreement continue in force after the date of termination of the agreement. These include, but are not limited to, the non-competition provision included in paragraph 16 of the employment agreement. The non-competition provision applies to parishes in which Dr. Coffman does business at the time of termination of your employment agreement (8/15/08). Dr. Coff-man currently maintains a practice in West Monroe (Ouachita Parish) and Ruston (Lincoln Parish).
Dr. Smith filed this action in Lincoln Parish on August 21, 2008. Dr. Smith’s petition asserted four causes of action against Dr. Coffman and the Coffman Corporation and requested a jury trial. First, he asked for a declaratory judgment in his favor establishing that he could *143 work in Lincoln Parish. Secondly, he requested damages for attempting to enforce an illegal non-competition agreement. Next, he claimed that Coffman’s act of opening a “shell” office in Lincoln Parish is a violation of the Louisiana Unfair Trade Practices Act. In addition, Dr. Smith requested specific performance, requiring Coffman to pay for the cost of tail insurance for malpractice coverage. Later, in 2009, Dr. Smith filed a supplemental petition requesting unpaid wages, unpaid bonus payment, penalty wages, and attorney fees.
Dr. Smith began practicing in Ruston in September 2008, and no injunctive action by Coffman to prevent Dr. Smith’s employment ever occurred. As a result of Dr. Smith’s motion for partial summary judgment, on July 15, 2010, the trial court held that the non-compete clause of the Contract could not be enforced against Dr. Smith in Lincoln Parish.
17A three-day jury trial on the remaining issues occurred in July 2010. The jury held that Dr. Smith was terminated without lawful cause. As a result, the jury held that Coffman was obligated to pay $120,451 for the tail insurance. While the jury did not award Dr. Smith any damages under the Louisiana Unfair Trade Practice Act, it did award him damages under his general tort claim. The jury found that Coffman’s “wrongful attempt to enforce an invalid Non-Competition Agreement by trying to prevent Dr. Smith from practicing medicine in Lincoln Parish” resulted in mental anguish damages and awarded $25,000. Furthermore, the jury found that Coffman failed to pay Dr. Smith $8,221 in salary and his $4,000 bonus.
As previously agreed by the parties, the issues of penalty wages, attorney fees and costs pursuant to La. R.S. 23:631, 23:632, and the Contract were decided by the trial court. The trial court found in the plaintiffs favor and awarded him $73,972.80[1] in penalty wages, $17,526 in statutory attorney fees for the unpaid wage claims, $93,148.80 in attorney fees under the Contract, and $16,501.91 in court costs. As a result of this adverse ruling, Coffman appeals, asserting nine assignments of error.

Discussion

I.
Coffman’s first two assignments of error concern the jury’s ruling that Dr. Smith was terminated without lawful cause and that Coffman became obligated to pay $120,451 for the expense of the malpractice tail [scoverage. These issues involve the interpretation of paragraphs 1, 12 and 13 of the Contract and Dr. Coffman’s letter to Dr. Smith dated July 3, 2008.
A contract is the law between the parties and regulates their respective rights and obligations. Winnon v. Davis, 32,988 (La.App.2d Cir.5/15/00), 759 So.2d 321. The issue of whether a contract is ambiguous is one of law. The interpretation of an unambiguous contract is also a question of law. Slocum-Stevens Ins. Agency, Inc. v. International Risk Consultants, Inc., 27,353 (La.App.2d Cir.12/11/95), 666 So.2d 352, writ denied, 96-0102 (La.3/8/96), 669 So.2d 399; Town of Haynesville, Inc. v. Entergy Corp., 42,-019 (La.App.2d Cir.5/2/07), 956 So.2d 192, writ denied, 07-1172 (La.9/21/07), 964 So.2d 334; Stephenson v. Petrohawk Properties, L.P., 45,296 (La.App.2d Cir.6/2/10), 37 So.3d 1145. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpre- *144 tation may be made in search of the parties’ intent. La. C.C. art. 2046.
The parties’ Contract defines a three-year term that would automatically extend thereafter year to year unless either of the parties elected to end the employment relationship by written notice. This expiration of the Contract’s term addressed in paragraph 1 is distinguished from the termination of the Contract under paragraph 13 of the agreement. Paragraph 13 addresses the end of the Contract that might occur at anytime during its term. Aside from the death or disability of Dr. Smith which might terminate employment, Coff-man had the two options to terminate Dr. Smith’s employment, (1) for “cause,” or (2) “at will” solely at Coffman’s ^option.[2] None of the seven grounds for “cause” defined in the Contract occurred in this instance.
With this understanding of the Contract, the two conflicting positions of the parties from which the jury was asked to choose are summarized as follows:
Did the Contract terminate under paragraph 13d by the exercise of Coffman’s option to terminate Dr. Smith’s employment without cause? or
Did the Contract expire at the end of its three-year term by the operation of paragraph 1?
The jury’s choice over how the Contract ended has importance in this dispute for the operation of paragraph 12 of the Contract and the determination of the party responsible for the expense of the malpractice tail coverage. Paragraph 12 addresses the consequences concerning the insurance expense in the event of “termination” of the Contract under paragraph 13 or Dr. Smith’s resignation from employment. It does not assign an obligation on either party to pay for the cost of tail coverage in the event that the Contract simply expires at the conclusion of its term. Thus, after the jury determined that Coffman exercised the option under paragraph 13(d) and terminated Dr. Smith’s employment without cause, it properly applied paragraph 12 and assessed Coffman the $120,451 expense for the tail coverage. Nevertheless, Coffman argues that the jury was manifestly erroneous in failing to find that the Contract simply expired at the end of its |interm on August 15, 2008, and was never terminated by Coffman’s actions under paragraph 13.
Significantly, the Contract called for written notice by Coffman to signify its decision either to terminate Dr. Smith’s employment under paragraph 13(d) or to elect for the Contract to expire at the end of its term. The only written notice given was Dr. Coffman’s letter which Dr. Smith received on July 3. In the absence of ambiguity in that letter, the effect of the written notice like the overall Contract presents a question of law. When appellate review is not premised upon any factual findings made at the trial court level, but is instead based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or incorrect. Industrial Roofing & Sheet Metal Works, Inc. v. J.C. Dellinger Memorial Trust, 32,-048 (La.App.2d Cir.8/20/99), 751 So.2d 928, writs denied, 99-2948, 99-2958 (La.12/17/99), 752 So.2d 166; Noel v. Discus Oil Corp., 30,561 (La.App.2d Cir.5/13/98), 714 So.2d 105; McDuffie v. *145 Riverwood Int’l Corp., 27,292 (La.App.2d Cir.8/23/95), 660 So.2d 158.
From our review of the July 3 letter, we find that Coffman unambiguously exercised its right under paragraph 1 of the Contract and gave notice of its election for the Contract to expire at the end of its term. That election by Coffman and notification to Dr. Smith “not to renew” the Contract was required “not less than thirty (30), nor more than sixty (60) days” prior to August 15, 2008. The notice was given 43 days prior to the |n last day of the Contract’s term. Twice in the letter, Dr. Coffman assured Dr. Smith that his salary would remain the obligation of Coffman “through the end of your contract.” In contrast, a 30-day notice letter given pursuant to paragraph 13(d) for the employer’s at-will termination of employment would not require payment of Dr. Smith’s salary for the remaining 43-day contractual term. The letter also references the parties’ negotiations which attempted to renew the Contract with some salary adjustment in Dr. Smith’s favor. There was no factual dispute that such negotiations had been conducted or that agreement over Dr. Smith’s financial compensation had not occurred. The subject matter of the negotiations was the August 15, 2008, end of the Contract and its possible extension. The July 3 letter references the impasse for the continuation of the Contract when it notes that the financial benefits “are unacceptable to you [Smith].” Dr. Smith admitted in his testimony that prior to July 3, a renewal with better compensation had not been finalized, and his notice on June 26, 2008, to receive no new OB patients revealed circumstantially his understanding that the Contract was in jeopardy for further extension after August 15.
Dr. Smith does dispute Coffman’s initial premise of the July 3 letter that Dr. Smith had previously made and expressed his decision to leave the practice. Dr. Smith explained in his testimony, “I had no intention of leaving, I just had intentions of fairer terms for the contract.” Nevertheless, this does not create any ambiguity suggesting that the letter was a 30-day notice of termination. Coffman had a unilateral right to elect to allow the Contract to expire regardless of Dr. Smith’s contrary desires. Moreover, | ,2even assuming Dr. Coffman misunderstood Dr. Smith’s intentions for leaving, his expression of “regret” that Dr. Smith “will be leaving this practice” reflects that Dr. Coffman did not intend for Dr. Smith to leave in 30 days, or by August 2, as though being fired from employment. The paragraph 13(d) at-will termination is the employer’s option to fire the employee without cause, and the July 3 letter reflects no such dismissal. The letter unambiguously states that the Contract will end on August 15 following “the remainder of the contract period.”
The other issue which Dr. Smith raises concerns Coffman’s decision to relieve Dr. Smith from continuing in his practice with his patients. The July 3 letter expressed that such discontinuation of his practice might occur “for the continuity of patient care.” On July 7, Dr. Smith was in fact relieved of those duties. Thereafter, although Dr. Smith attempted unsuccessfully to contact Dr. Coffman about his being relieved of his patient care, Dr. Smith never made an objection or claim that the Contract had been breached because of the action. The Contract provides in paragraph 2 that the “Employee shall provide medical services to patients ... as requested by Employer.” Additionally, in the analogous situation for the “winding up”[3] of Dr. Smith’s services in the event of *146 a termination of employment, paragraph 15 of the Contract allowed Coffman the right to terminate the active services of Dr. Smith during the 30-day notice period of any termination. Although the Contract does not specifically address the | ^winding up of Dr. Smith’s practice upon the expiration of the three-year term, we do not find Coffman’s action unreasonable. In any event, it was incumbent upon Dr. Smith to voice any objection to what was proposed in the July 3 letter and ultimately carried out after July 7.
In a very similar case, Barbe v. A.A. Harmon & Co., 94-2423, 94-2424 (La.App. 4th Cir.1/7/98), 705 So.2d 1210, writs denied, 98-0526, 98-0529 (La.5/15/98), 719 So.2d 462, an employee was given the requisite written notice that his employment contract would not be renewed 50 days before its expiration. He was advised that he would be put on inactive status and should not report to work. Since the employee only had the obligation to perform services upon the employer’s request, the court held that the contract was not breached and merely expired by its own terms at the end of the 50 days since the employee was paid his salary under the contract.
Our interpretation that the July 3 letter reflects only a notification of the expiration of the Contract on August 15 is therefore not altered by the proposal contained in the letter to end Dr. Smith’s medical services before August 15. Such proposal for the winding up of Dr. Smith’s services did not amount to a breach of the Contract, was not formally objected to by Dr. Smith in an effort to suggest a different manner of ending his services to Coffman, and could not transform Coffman’s clear election for expiration of the Contract into a 30-day termination of employment.
Accordingly, the jury’s contrary view of the written notification of July 3 was legally incorrect as the contractual notification was an | ^unambiguous notification of the expiration of the Contract. Since neither party owed an obligation for the cost of the malpractice tail coverage under paragraph 12 upon the Contract’s expiration, the judgment of $120,451 against Coffman for that expense is reversed.
II.
Citing Coffman’s assertions regarding its proposed enforcement of the non-competition provision of the Contract and Coff-man’s alleged sham office in Ruston (Lincoln Parish), Dr. Smith also claims that Coffman violated the Louisiana Unfair Trade Practices Act (“LUTPA”) and is liable under “general tort law.” On August 21, 2008, six days after the end of the Contract, Dr. Smith filed this action which included those claims and also sought relief by declaratory judgment concerning the inapplicability of the non-competition agreement. In response, Coffman never asserted any injunctive action, and Dr. Smith proceeded with his new employment in Ruston which began on September 10, 2008. While Dr. Smith presented no claims for economic or special damages, he asserted general damages for mental anguish.
The jury answered the following six interrogatories which distinguished between the LUTPA and tort claims:

Louisiana Unfair Trade Practices Act

6. Did the Employer/Dr. Coffman Corporation knowingly engage in an “unfair or deceptive method, act or practice” by attempting to open an office in Lincoln Parish in order to *147 prevent the Employee/Dr. Smith from practicing medicine in Lincoln Parish?
X YES _ NO
| |S7. Did the Employee/Dr. Smith suffer from an ascertainable loss of money and/or property, and/or mental anguish, as a result of this unfair trade practice?
_YES X NO
8. Did the Employer/Dr. Coffman Corporation knowingly engage in an “unfair or deceptive method, act or practice” by causing a letter to be sent to the Employee/Dr. Smith on August 8, 2008, that claimed that the Employee/Dr. Smith voluntarily resigned employment on August 15, 2008?
_YES X NO

General Tort Law

12. Did the Employer/Dr. Coffman Corporation wrongfully attempt to enforce an invalid Non-Competition Agreement by trying to prevent Employee/Dr. Smith from practicing medicine in Lincoln Parish?
X YES _NO
13. Did the Employee/Dr. Smith suffer damages, including mental anguish, as a result of the Employer/Dr. Coffman Corporation attempting to enforce an invalid Non-Competition Agreement?
X YES _ NO
14. What amount of money would fairly compensation Employee/ Dr. Smith as a result of the Employer/Dr. Coff-man Corporation attempt to enforce the invalid Non-Competition Agreement?
$25.000
The trial court’s judgment, enforcing the jury’s verdict, denied and dismissed Dr. Smith’s LUTPA claim. With the absence of any answer to the appeal by Dr. Smith, that judgment is now final. Dr. Smith argues that the $25,000 verdict for his general tort claim should be affirmed on the strength of the decision in Preis v. Standard Coffee Service Co., aDiv. of Wm. B. Reilly and Co., Inc., 545 So.2d 1010 (La.1989). Coffman argues that “a failed attempt to do something that causes no damages cannot be a tort.”
| ifiThe Preis ruling urged by Dr. Smith is a procedural ruling under Louisiana’s former res judicata law. The employee’s claim did involve an alleged improper enforcement by the employer of a non-solicitation agreement in an employment contract. In a prior action, the employee had counterclaimed alleging an unlawful interference with his right to do business. In the second suit, the Preis court held that the employee’s suit based upon LUTPA was barred by res judicata. In dicta, the court observed that the employer’s improper assertions and actions to enforce the nonsolicitation agreement are “actionable under both the general tort law and the Unfair Trade Practices” law. Id. at 1013.
A review of Preis reveals that a substantive analysis of the nature of any “general tort law” was not elaborated, and the ruling which centered around res judicata law is not controlling. The later ruling of the Supreme Court in Arco Oil & Gas Co., a Div. of Atlantic Richfield Co. v. De-Shazer, 98-1487 (La.1/20/99), 728 So.2d 841, provides much better guidance for review of Dr. Smith’s tort award.
Arco v. DeShazer addressed the question of the meaning of “damages” under La. C.C.P. art. 3608[4] in a case where the employer had wrongfully obtained the is *148 suance of a temporary restraining order (“TRO”) against its former employee. The employee asserted that the awardable damages not only included his special and economic losses but also his |17mental anguish. The court interpreted the statutory meaning of these special damages arising out of a wrongful injunction to be broad enough to allow a court to compensate for the mental damages of the defendant. Nevertheless, by analogy to tort law governing the intentional infliction of emotional distress, the court held:
In contrast to tort law, recovery of damages under Article 3608 is not based on fault. Article 3608, a procedural article, simply permits recovery of damages in cases where injunctive relief was issued when it should not have been, because the plaintiff had no right to such relief. Therefore, a standard which permits recovery of mental anguish damages only under limited circumstances is even more applicable here, in the context of wrongfully issued injunctive relief, than it is under the fault-based concepts of tort law. Moreover, failure to impose this higher standard for recovery of mental anguish damages would have a chilling effect on parties who believe in good faith that they are entitled to in-junctive relief. Therefore, we conclude that it is appropriate to borrow this standard from tort law. Accordingly, we hold that damages for mental anguish are recoverable under Article 3608 only in the presence of special circumstances involving outrageous or egregious conduct.
Id. at 845.
Thus, under Arco v. DeShazer, if Coffman had wrongfully obtained a TRO or preliminary injunction causing Dr. Smith mental anguish, the measure of recovery of his damages would be under the same criteria for the determination of the tort of intentional infliction of emotional distress. In order to recover for intentional infliction of emotional distress, a plaintiff must establish that (1) the conduct of the defendant was extreme and outrageous; (2) the emotional distress suffered by the plaintiff was severe; and (3) the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. White v. Monsanto Co., 585 So.2d 1205 (La1991);is Moresi v. State, Through Dept. of Wildlife and Fisheries, 567 So.2d 1081 (La.1990). Minimal and normal inconvenience is not compensable. Arco v. DeShazer, supra at 845.
In the present case, where possible injunctive action to enforce the non-competition agreement was merely implied but never utilized, we view Dr. Smith’s claim in tort as a claim for the intentional infliction of emotional distress. Dr. Smith’s claim clearly seeks to remedy an intentional threatening act. Otherwise, under the general rule in tort, if the defendant’s conduct is merely negligent and causes only mental disturbance, without accompanying physical injury, illness or other physical consequences, the defendant is not liable for such emotional disturbance. Moresi, supra at 1095. The Louisiana tort claim for intentional infliction of emotional distress is an independent tort, “not ‘parasitic’ to a physical injury or a traditional tort such as assault, battery, false imprisonment, or the like.” White, supra at 1208.
*149 Considering the jury’s $25,000 award for Dr. Smith’s emotional distress damages, we find that the special circumstances involving outrageous or egregious conduct were not shown and that the emotional distress suffered by Dr. Smith was not severe. Coffman’s attorney’s letter to Dr. Smith suggesting that the scope of the non-competition agreement extended to Lincoln Parish may have been an exaggerated claim of Coffman’s contractual rights. Nevertheless, there were facts shown surrounding the opening of a Ruston office. When challenged by Dr. Smith, Coffman did not assert its weak contractual claim through an injunctive Inaction. Even if Coffman was guilty of a frivolous assertion of its contractual rights, we find that the high standard for the recovery of mental anguish damages does not allow this contract-related dispute to be converted into the tort of intentional infliction of emotional distress. Accordingly, the general tort damage award of $25,000 is reversed.
III.
Coffman’s next assignments of error concern whether Smith received his proper salary through the end of the term of the Contract and whether the wage law penalties and attorney fees were properly imposed by the trial court.
Although the Contract called for a $250,000 salary, Coffman voluntarily increased the salary by $50,000. Dr. Smith began receiving this increased salary in March 2008. Yet, Dr. Smith’s final two paychecks of July 25 and August 8 did not include the increase. Additionally, the jury found that Dr. Smith did not receive his salary for his final contracted week of work. As a result, the jury decided that these amounts were owed and awarded Dr. Smith $8,221 in unpaid wages. This amount encompasses payment for Dr. Smith’s final week of work as well as increasing his final two paychecks to account for his $50,000 raise. While Dr. Smith requested an award of $9,615.39,[5] the jury’s award was $8,221.
“When factual findings are pertinent to the interpretation of a contract, these determinations are not to be disturbed by a reviewing court |2nin the absence of manifest error.” Mount Mariah Baptist Church, Inc. v. Pannell’s Associated Elec., Inc., 36,361 (La.App.2d Cir.12/20/02), 835 So.2d 880, writ denied, 03-0555 (La.05/02/03), 842 So.2d 1101. Under the manifest error standard, in order to reverse a trial court’s determination of a fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Bonin v. Ferrellgas, Inc., 03-3024 (La.7/2/04), 877 So.2d 89; Stobart v. State through Dept. of Transp. and Dev., 617 So.2d 880 (La.1993), as cited in Allerton v. Broussard, 10-2071 (La.12/10/10), 50 So.3d 145.
After the contract extension negotiations stalled in the spring of 2008, Coff-man’s office manager presented Dr. Smith with a paper describing his new bonus schedule and informed him that he would be given a $50,000 raise in his salary. The simple statement regarding the salary read: “Salary $300,000 ($50,000 increase) effective immediately.” Coffman argues *150 that the raise was a discretionary incentive to retain Dr. Smith, and as a result, could be terminated at any time.
Coffman’s argument neglects the fact that Dr. Smith received and deposited his increased salary checks between March 21 and July 11, thereby evidencing his consent to these amended terms of his salary. As the jurisprudence has stated: “When an employer promises a benefit to employees, and employees accept by their actions in meeting the conditions, the result is not a mere gratuity or illusory promise but a vested right in the |2iemployee to the promised benefit.” Knecht v. Board of Trustees for State Colleges and Universities and Northwestern State Univ., 591 So.2d 690 (La.1991). Likewise, the law is clear that written contracts may be modified by oral contracts and the conduct of the parties. Grosjean v. Grosjean, 45,529 (La.App.2d Cir.10/13/10), 50 So.3d 233, writ denied, 10-2619 (La.2/4/11), 56 So.3d 980, writ denied, 10-2623 (La.2/4/11), 57 So.3d 311.
Based upon the parties’ actions in modifying the compensation under the Contract, Dr. Smith’s raise and the bonus schedule became binding upon Coffman.
Coffman next asserts that Dr. Smith received 26 biweekly payments for his salary during the last calendar year of the Contract (August 15, 2007—August 14, 2008), with his first biweekly paycheck issued on August 24, 2007, after only nine days into the last year. At trial, Coff-man’s financial expert first indicated that Dr. Smith did receive his entire salary for the last year of the Contract in 26 biweekly installments. Nevertheless, confusing the matter, he also testified that the salary for Dr. Smith’s final week would not have been paid until August 21, 2008, and no such payment was ever made. In addition, the final check that Dr. Smith received was dated as payment from July 25 to August 7. As a result, the jury heard conflicting testimony regarding this issue, and thus, we can not say that their decision is manifestly erroneous. In addition, Dr. Smith did not appeal the jury’s calculations in awarding him $8,221 instead of $9,615.39. As a result, we affirm the jury’s finding that Dr. Smith was not paid his $8,221 in salary.
122ln addition, the jury awarded Dr. Smith a $4,000 bonus payment. Under the revised written terms of the bonus schedule that he received in March, Dr. Smith would be entitled to a bonus if his revenue generated in the medical practice was above $150,000. Dr. Smith claimed that his revenue for the first financial quarter (January-March) was shown to be $160,000, and the jury held that he earned the bonus. While the original bonus provision of the Contract stated that the employee may receive an incentive bonus, the revised bonus provision did not condition such payment in discretionary terms. Instead, the supplemental bonus schedule used more definitive terms and stated that Dr. Smith’s bonus will be paid quarterly. Coffman argues that the bonus schedule revealed to Dr. Smith in March did not apply retroactively for the first quarter of 2008. While Dr. Smith did not receive the amended bonus schedule until March 2008, Coffman’s financial quarterly report displayed that Dr. Smith obtained a $4,000 bonus. Additionally, Dr. Coffman admitted in his testimony that had he known that Dr. Smith earned a bonus, he would have paid it. Accordingly, the jury’s award of this bonus amount to Dr. Smith is not clearly wrong.
Next, Coffman argues an affirmative defense of set-off which it admittedly never pled. However, Coffman argues that the pleadings were enlarged by the evidence to include the set-off claim *151 against any unpaid wages and bonus amounts. Dr. Smith testified that Coff-man gave him $30,000 to help him purchase a home. Since this fact was not relevant to any other claim, Coffman argues that this enlarged the pleadings to allow [ 2»for set-off. Nevertheless, any fact issues surrounding the $30,000 were not presented to the jury via the jury charge, and the record merely showed the transaction to be a donation. Accordingly, the claim for set-off is without merit.
After the jury awarded Dr. Smith his unpaid wages, the trial court decided the remaining issues of penalty wages and attorney fees in a separate ruling. The claim and demand for unpaid wages by Dr. Smith first occurred over a year after the institution of this suit, by amended petition on December 17, 2009. The trial court awarded Dr. Smith 90 days’ worth of salary as penalty wages, $73,972.80 attorney fees pursuant to La. R.S. 23:631 and 23:632. Coffman challenges the penalty.
La. R.S. 23:631 entitled Discharge or Resignation of Employees; Payment after Termination of Employment, provides, in pertinent part, as follows:
A.(l)(a) Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.
(b) Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle during which the employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.
(2) Payment shall be made at the place and in the manner which has been customary during the employment, except that payment may be made via United States mail to the laborer or other employee, provided postage has been prepaid and the envelope properly addressed with the employee’s or laborer’s current address as shown |j>4in the employer’s records. In the event payment is made by mail the employer shall be deemed to have made such payment when it is mailed. The timeliness of the mailing may be shown by an official United States postmark or other official documentation from the United States Postal Service.
(3) The provisions of this Subsection shall not apply when there is a collective bargaining agreement between the employer and the laborer or other employee which provides otherwise.
B. In the event of a dispute as to the amount due under this Section, the employer shall pay the undisputed portion of the amount due as provided for in Subsection A of this Section.
The penalty for the violation of La. R.S. 23:631 is set forth in La. R.S. 23:632, which provides:
Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be hable to the employee either for ninety days wages at the employee’s daily rate of pay, or else for full wages from the time the employee’s demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penal *152 ty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.
The trial court’s determination of the wage penalty of $73,972.80 was premised upon the jury’s prior verdict that “Dr. Smith was terminated without lawful cause.” This court has now reversed that finding by the jury and determined that the Contract merely expired by its own terms at the end of its three-year term and that Dr. Smith was not fired. Likewise, Dr. Smith did not choose to terminate the Contract by his unilateral resignation, as that right was expressed in paragraph 12 of the Contract. This court’s ruling therefore calls into question whether a “discharge” or “resignation” of an employee occurred so as to trigger the application of the penal statute. Our preview of the language of the statutes and the jurisprudence convinces us that this penal provision does not apply.[6] As with other punitive damage provisions in this state, this wage statute must be strictly construed, should not be extended beyond the plain wording of the statute, and must yield in interpretation and application to equitable defenses. Scallan v. Mark Petroleum Corp., 303 So.2d 498 (La.App. 2d Cir.1974), writ denied, 307 So.2d 370 (La.1975) as cited in Keith v. Little, 434 So.2d 548 (La.App. 2d Cir.1983).
In Franklin v. Ram, Inc., 576 So.2d 546 (La.App. 2d Cir.1991), the plaintiff was hired by Ram to be a welding supervisor in Brazil. He had previously worked off and on with Ram for about 13 years. Plaintiff arrived May 15,1988, and finished his work on June 24, 1988. His wages were controlled by three contracts governing various aspects of his work and his corporation. Under these employment contracts, the court determined that plaintiff was employed for a set period of time. Thus, the plaintiffs employment ended under the contract by an identified event that occurred on June 24, 1988. This court centered its discussion around the salary owed to the plaintiff under all of these contracts. The plaintiff cited Urian v. Bullard, 380 So.2d 707 (La.App. 4th Cir. 1980), writ denied, 383 So.2d 783 (La.1980), as authority that penalty wages were due. In Urian, the employee quit one day before the end of her term. After distinguishing Urian from the present case, the court stated that “apparently the court wasj^of the opinion that she either resigned or was discharged; we feel that neither event occurred in the present case.” See also, Chester v. Davis, 61 So.2d 243 (La.App. 2d Cir.1952).
In Collins v. Joseph, 250 So.2d 796 (La. App. 4th Cir.1971), the plaintiff entered into a contract with a marketing research group to perform 50 interviews between January 21 and January 24, 1969. She was paid based upon the number of hours expended on the job and reimbursed for gas and postage. While she earned $32.20 in services, the defendant did not pay her until July 2, 1969, Addressing the issue of an employee “discharge,” the court said, “A simple reading of those statutes quite clearly shows that they apply to a situation wherein the employee is Discharged by the *153 employer or when the employee has Resigned. In the present case the record is quite clear that neither of these two events took place.” Since she had performed all of the interviews and work required under the contract, “the contract was over and there was nothing further for her to do. She was neither discharged nor had she resigned.” After quoting Chester v. Davis, the court noted that these facts would be dispositive of the case were it not for the parties’ stipulation that the only issue concerned whether Mrs. Collins was an independent contractor. Even though Mrs. Collins was not timely paid for her services, the statute did not apply in her situation because the employment contract expired by its own terms. Since she had already performed the work fully and the contract’s term had ended, Mrs. Collins was not discharged nor did she resign, rendering La. R.S. 23:631 inapplicable.
|27In order to strictly construe the statute, it is necessary to define discharge; Black’s Law Dictionary defines discharge as “the firing of an employee.” Black’s Law Dictionary (9th ed.2009). Since Dr. Smith was not fired or discharged, this statute is not applicable and does not trigger La. R.S. 23:632’s penalties. Therefore, the trial court erred in awarding Dr. Smith penalty wages and statutory attorney fees.
IV.
With the total damages awarded under the trial court judgment being $231,644.80, including the wage penalty award, the trial court awarded Smith $17,526 in attorney fees under the penalty wage statute and $93,148.80 in attorney fees under the authority of the Contract.[7] Our findings have confirmed that Coffman breached the Contract in the amount of $12,221, reversing much of the trial court judgment in favor of Smith. Accordingly, we find that a reasonable attorney fee award for this $12,221 dispute is $20,000.

Conclusion

For the foregoing reasons, we affirm that portion of the judgment awarding the plaintiff $12,211 for his unpaid salary and bonus and award $20,000 for his attorney fees in obtaining this award and defending against defendant’s assertions of the covenant not to compete. All other awards of | j>8the judgment in plaintiffs favor are reversed. Costs of appeal are assessed to appellee.
AFFIRMED IN PART AND REVERSED IN PART.
SEXTON, J. (Pro Tempore), concurs in part and dissents in part and assigns reasons.

. The penalty wages were calculated as follows: Plaintiff's annual salary of $300,000 divided by 365 days equals $821.92, the daily rate of pay. The daily rate of pay, $821.92 times 90 days equals $73,972.80.

. Coffman’s at-will termination option was somewhat disparagingly referenced in the jury interrogatories as termination "without lawful cause.” Coffman’s at-will option to terminate employment for no "cause” is a lawful option under the Contract.

. The parties' concern for “winding up” of patient services addressed in the Contract *146 must be understood in view of the covenant not to compete which restricted Dr. Smith’s medical practice in Ouachita Parish for two years after the contract ended.

. La. C.C.P. art. 3608 provides:
The court may allow damages for the wrongful issuance of a temporary restraining *148 order or preliminary injunction on a motion to dissolve or on a reconventional demand. Attorney's fees for the services rendered in connection with the dissolution of a restraining order or preliminary injunction may be included as an element of damages whether the restraining order or preliminary injunction is dissolved on motion or after trial on the merits.

. His last two paychecks were for $9615.38 rather than $11,538.46. Thus, Dr. Smith was not fully paid the difference, $1,923.08 x 2 or $3,846.16. In addition, Dr. Smith was not paid for his final week of work. Each paycheck was for two weeks or $5,769.23 per week. These amounts added together, $5,769.23 + $3,846.16 = $9615.39, are the amount requested by Dr. Smith.

. In his brief and oral arguments, Dr. Smith’s counsel conceded that La. R.S. 23:631-632 only apply in cases involving resignation or discharge of an employee. He admitted that they do not apply in cases where the employment merely expires by its own terms, but he continued to argue that this did not occur in this case as Dr. Smith had been discharged.

. Provision 35 of the Contract governs the award of attorney fees to the successful party. It provides that: In the event it is necessary for any party to retain the services of an attorney to initiate legal proceedings to enforce the terms of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party, in addition to all other remedies, all costs of such enforcement, including reasonable attorney fees and costs and including trial and appellate proceedings.